IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TODD A. WEILER, )
    Plaintiff, )
)
v. ) Case No. 1:10cv157
)
ARROWPOINT CORPORATION, et al., )
    Defendants. )

## MEMORANDUM OPINION

This diversity action alleging fraud and breach of contract came before the Court on defendants' motions to dismiss. Defendants contend that plaintiff has not alleged facts that give rise to a plausible entitlement to relief, and thus dismissal is appropriate pursuant to Rule 12(b)(6), Fed. R. Civ. P. Plaintiff contends that threshold dismissal is unwarranted as the complaint contains factual allegations plausibly supporting all claims asserted. The motions have been fully briefed and argued, and accordingly are now ripe for disposition.

I.[1]

Plaintiff, Todd Walker, is a resident of Florida. Individual defendants Chrystle Small and Jeffrey Satterly are residents of Virginia, and corporate defendants Arrowpoint Corporation ("Arrowpoint"), Arrowpoint International Corporation ("Arrowpoint International"), and Virginia Commerce Bank are all organized under the laws of Virginia with principal places of business in Virginia. Defendant Small is the president and chief executive officer of Arrowpoint,

---

[1] The facts recited herein are derived from plaintiff's complaints and, as required at this stage in the proceedings, are assumed to be true. *See Revene v. Charles County Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

-1-

a small business that provides information technology and consulting services to government and government contractors, and Arrowpoint International is a related company. Defendant Satterly is a senior vice president of Virginia Commerce Bank, a regional bank that offers loans to commercial clients, including Arrowpoint. Arrowpoint and Small are collectively referred to herein as "Arrowpoint defendants," and Virginia Commerce Bank and Satterly are collectively referred to herein as "Bank defendants."

This case arises out of Arrowpoint's 2008 repurchase of plaintiff's ownership interest in the company. Beginning in January 2003 and continuing until August 2008, plaintiff was employed as an executive at Arrowpoint, and during that time he also held a seat on Arrowpoint's board of directors and owned 4500 shares of common stock—representing 48.35 percent of the company's equity. On August 8, 2008, following a failed merger attempt, plaintiff and Arrowpoint entered into a stock redemption agreement ("SRA") whereby Arrowpoint agreed to purchase Weiler's interest in Arrowpoint for $4 million, with $955,071 as an initial payment in cash and discharge of indebtedness, and the balance, $3,044,929 by a promissory note.

Importantly, the SRA states that the closing of the share redemption is subject to approval "from the Company's existing lender," Virginia Commerce Bank. Compl. Ex. 1 at 1. The promissory note itself—a draft copy of which was attached to the SRA—states that plaintiff's "[r]ight to payment . . . will be subordinated to any existing and future secured debt," and that plaintiff "hereby agrees, upon the written request of [Arrowpoint], to enter into subordination agreement[s] as reasonably requested" by Arrowpoint or by Arrowpoint's senior lender. Compl. Ex. 3 at 4. Additionally, while plaintiff alleges that in agreeing to the SRA, he relied on defendant Small's assurances that Arrowpoint would make timely payments under the

promissory note, but the SRA provides, in pertinent part, as follows:

> (e) <u>No inducements</u>. Neither the Company nor any other party has made any oral or written representation, inducement, promise or agreement to Shareholder in connection with the purchase and redemption of the Shares, other than as expressly set forth in this agreement.

Compl. Ex. 1 at 2. Plaintiff does not allege that Virginia Commerce Bank or defendant Satterly (collectively referred to herein as "Bank defendants") were involved in any way with the negotiation of the SRA or that they knew of the terms of the SRA in advance of its execution.

Thereafter, in September 2008, Arrowpoint's credit facility agreement with Virginia Commerce Bank came up for its annual review and renewal, a fact of which plaintiff was aware as a result of his role with Arrowpoint. Plaintiff also knew that the credit facility agreement between Arrowpoint and Virginia Commerce Bank in existence at the time of execution of the SRA in August 2008 required Arrowpoint (i) to maintain a net worth of $1,500,000, (ii) to maintain positive net income on a year-to-year basis, and (iii) to retain at least 25 percent of its net income. In September 2008, Virginia Commerce Bank told Arrowpoint that bank approval of the SRA was contingent on Arrowpoint agreeing to new covenants that strengthened the net worth and net income requirements. Arrowpoint agreed to the new covenants in conjunction with the renewal of the credit facility agreement, and thus Virginia Commerce Bank approved the SRA. Plaintiff did not ask defendants about the covenants, and noone volunteered this information to plaintiff.

Subsequently, on October 15, 2008, plaintiff and Virginia Commerce Bank entered into a Creditor's Subordination Agreement (the "Subordination Agreement") subordinating Arrowpoint's debt to plaintiff under the promissory note to Arrowpoint's debt to Virginia

Commerce Bank. Specifically, the Subordination Agreement provides that

> [w]hile any Superior Indebtedness remains unpaid or until there is any obligation on the part of [Virginia Commerce] Bank to advance monies which would constitute Superior Indebtedness hereunder, [plaintiff] will not ask for, demand, sue for, take, receive or accept from [Arrowpoint], by setoff or in any other manner, any payment or distribution on account of [the promissory note] nor present any instrument evidencing [the promissory note] for payment. Notwithstanding the foregoing, until such time as a default may occur or a demand for payment may be made upon any portion of the Superior Indebtedness, and until [Virginia Commerce] Bank shall notify [plaintiff] in writing of the occurrence of such default or of any such demand for payment, [Arrowpoint] may continue to remit, and [plaintiff] may retain regular scheduled monthly periodic payments . . . .

Compl. Ex. 2 at 2. Additionally, the Subordination Agreement states that Virginia Commerce Bank may at any time "without the consent of or notice to" plaintiff, "enter into or amend in any manner any other agreement relating to the Superior Indebtedness (including provisions restricting or further restricting payment of [the promissory note])." *Id.* at 3. Thus, the Subordination Agreement, by its terms, operates in pertinent part (i) to prevent plaintiff from seeking or receiving payment on the promissory note while the debt to Virginia Commerce Bank "remains unpaid" or is in "default," and (ii) to allow Virginia Commerce Bank to modify its agreements with Arrowpoint concerning Arrowpoint's payments to plaintiff on the promissory note.

The promissory note was executed on the same day as the Subordination Agreement, October 15, 2008. The note entitles plaintiff to monthly payments of $84,581 in principal, and an interest payment starting at $15,224.65 and decreasing by approximately $422 per month, beginning in February 2009 and continuing until January 2012, at which point the note would be paid in full under the payment schedule. Compl. Ex. 2 at 7. Yet, one month after the note was signed, on November 16, 2008, plaintiff was informed that Arrowpoint was having trouble

-4-

meeting certain covenants in Arrowpoint's credit facility agreement with Virginia Commerce Bank and thus Arrowpoint might not be able to begin making payments to plaintiff in February 2009, as scheduled. And indeed, Arrowpoint failed to make any payments on the note for ten months, until December 29, 2009, despite repeated demands by plaintiff and his counsel. During the time of nonpayment, Defendant Satterly—a vice president of Virginia Commerce Bank—informed plaintiff on March 10, 2010 that Arrowpoint "is not in compliance with the financial covenants detailed in the 9/25/09 commitment letter," and that accordingly, "Arrowpoint is not allowed to make the scheduled payments" on the note. Compl. at 15. Satterly's letter did not state that Arrowpoint was in default on the credit facility agreement or that it had failed to make scheduled payments to Virginia Commerce Bank. Thereafter, in a letter dated June 10, 2010, Satterly notified plaintiff that Virginia Commerce Bank considered Arrowpoint to have been in default since December 31, 2008. Compl. at 16.

On December 23, 2009, plaintiff informed Arrowpoint that he was exercising the acceleration clause contained in the note, and thus the full note amount of $3,044,929, plus eight percent interest, was due and payable. Six days later, on December 29, 2009, Arrowpoint made its first payment, in the amount of $15,959.05, and subsequently, Arrowpoint made payments in January and February 2010 in the amounts of $106,000 and $99,352.13, respectively. Plaintiff alleges that Arrowpoint is in breach of the promissory note and the SRA and thus seeks from Arrowpoint $1,137,706.80 the amount that was due in 2009 under the promissory note's payment schedule. Plaintiff further alleges that Small, Satterly, Arrowpoint, and Virginia Commerce Bank conspired to frustrate Weiler's expectation of payment under the promissory note by negotiating new financial covenants that Arrowpoint would be unable to satisfy, and that the

failure to disclose these new covenants to plaintiff was fraudulent.

Separate from—but related to—these allegations, plaintiff alleges that on February 25, 2009, Small—Arrowpoint's CEO—incorporated a new company, Arrowpoint International. Plaintiff alleges that Small created Arrowpoint International in order to divert funds, other assets, and business opportunities from Arrowpoint, thus causing Arrowpoint to be in noncompliance with its financial covenants with Virginia Commerce Bank. This noncompliance, of course, is the basis for Arrowpoint's 2009 nonpayment under the promissory note, and thus plaintiff alleges that he has suffered pecuniary harm as a result of this alleged fraudulent conduct.

In his thirteen-count complaint, plaintiff accuses defendants (i) of fraud and misrepresentation (Counts I–V), (ii) of breach of contract (Counts VI–VII), (iii) and of business conspiracy and unfair trade practices (Count VIII). He further requests equitable relief (Counts IX–X, XIII), including *quantum meruit* recovery and reformation of the SRA and Subordination Agreement, and declaratory relief (Counts XI–XII). Separate motions to dismiss all counts pursuant to Rule 12(b)(6), Fed. R. Civ. P., were filed (i) by Arrowpoint defendants and Arrowpoint International and (ii) by Bank defendants. The motions, having been fully briefed and argued, are now ripe for disposition.

## II.

Threshold dismissal pursuant to Rule 12(b)(6) is appropriate where the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It follows that to survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-

me accusation." *Iqbal*, 129 S. Ct. at 1949. And in this respect, it is also true that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to *legal* conclusions." *Id.* (emphasis added). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id., quoted in Walker v. Prince George's County, Md.*, No. 08-1462, 2009 WL 2343614, at *5 (4th Cir. July 30, 2009) (O'Connor, J.). Instead, the complaint must allege facts that, if true, plausibly satisfy each element of the claims for which relief is sought. Accordingly, defendants' motions to dismiss must be granted if the complaint does not allege a sufficient factual basis to create a plausible inference that plaintiff is entitled to relief.

### III.

Analysis properly begins with the choice of law issue, which is easily resolved here as the contracts in issue contain valid and enforceable clauses selecting Virginia law. Because this is a diversity action, the governing substantive law, including choice of law rules, is that of the forum state—in this case, Virginia. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). And it is well recognized that "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." *Colgan Air*, 507 F.3d at 275; *Tate v. Hain*, 25 S.E.2d 321, 325 (Va. 1943) (holding that the intent of the parties to choose governing law "'will always be given effect except under exceptional circumstances evincing a purpose in making the contract to commit a fraud on the law'") (quoting 11 Am. Jur. Conflict of Laws § 119). No such circumstances exist here; thus, the law of Virginia governs matters arising from the SRA, the subordination

agreement, and the promissory note, whether the causes of action sound in contract or in tort. *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (under Virginia law, choice of law clauses generally encompass contract-related tort claims).

## IV.

As discussed above, plaintiff's claims are appropriately divided into five categories: (i) fraud and misrepresentation, (ii) breach of contract, (iii) business conspiracy and unfair trade practices, (iv) equitable claims, and (v) claims for declaratory relief. Each of these categories of claims is separately addressed herein.

### A. Fraud and Misrepresentation Claims

In Counts I and II, plaintiff alleges that defendants knowingly and intentionally concealed the new financial covenants between Arrowpoint and Virginia Commerce Bank that "would make it impossible for [plaintiff] to obtain payment under the Promissory Note." Compl. at 23. Plaintiff further alleges that defendants knowingly misrepresented "that the only prerequisite to him from obtaining payments under the Promissory Note would be Arrowpoint's making regular payments" to Virginia Commerce Bank. *Id.* at 24. Additionally, plaintiff alleges that defendants never intended to fulfill their obligations under the SRA, the promissory note, and the SA, and that they fraudulently concealed this intent not to perform from plaintiff. Plaintiff further alleges that these misrepresentations induced him to enter into the SRA with Arrowpoint and the Subordination Agreement with Virginia Commerce Bank. Finally, plaintiff also alleges that Arrowpoint defendants fraudulently conveyed Arrowpoint's assets and business opportunities to Arrowpoint International in order to evade Arrowpoint's obligations to plaintiff. These claims are analyzed separately with respect to Arrowpoint defendants and Bank defendants.

*1. Against Arrowpoint Defendants*

It is well settled in Virginia that two elements are essential to a fraud claim: (i) a knowing misrepresentation or concealment of material fact, and (ii) reasonable and detrimental reliance on that misrepresentation or concealment. *See Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 597 (Va. 1984); *Packard Norfolk, Inc. v. Miller*, 95 S.E.2d 207 (Va. 1956). With respect to this second element, it is, of course, beyond argument that where a plaintiff alleges that he was fraudulently induced into entering into a contract, the fraudulent conduct must occur before the contract is signed for it to be possible, as a matter of logic, for the contract to result from detrimental reliance on the fraudulent conduct. Yet, in this case, plaintiff does not allege that Arrowpoint concealed any material facts until *after* the SRA was already executed.

Specifically, plaintiff alleges that Arrowpoint concealed the terms of the new financial covenants. But those covenants were not negotiated and agreed to until September 2008, after the SRA was executed in August 2008. There is no allegation that any discussions between Arrowpoint defendants and Bank defendants concerning new financial covenants occurred prior to September 2008, and any such allegation would be inconsistent with the allegation in the complaint that "[d]efendants *began* renegotiating the terms of the loan" between Virginia Commerce Bank and Arrowpoint "[i]n September 2008." Compl. at 10 (emphasis added). Thus, because the new financial covenants were not negotiated or agreed to until after execution of the SRAs, any fraudulent concealment of the covenants could not have induced plaintiff to sign the SRA.

The only allegation that plausibly suggests a fraudulent act by Arrowpoint defendants that induced plaintiff to sign the SRA is the allegation that Arrowpoint fraudulently concealed its

intent not to perform its obligations under the promissory note at the time that the SRA was executed. As support for this claim, plaintiff alleges that Small admitted during a meeting at a restaurant in Washington, D.C., on July 22, 2009, that Arrowpoint "never intended to pay Weiler." Compl. at 16. Additionally, the fact that Arrowpoint did not make a single payment on the note until December 2009 suggests the possibility of "prompt, substantial nonperformance" that supports the inference that Arrowpoint never intended to perform. *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 380 (4th Cir. 2008) (stating, in a False Claims Act fraudulent inducement case, that "prompt, substantial nonperformance" supports inference that party did not intend to perform at time of contract execution). Thus, while discovery may well reveal that there is inadequate evidence to support the fraudulent inducement claim, the complaint alleges sufficient factual matter to allow the intent-not-to-perform fraudulent inducement claim to proceed against Arrowpoint defendants.[2] Count II, which alleges fraud and deceit with respect to the financial covenants, is appropriately dismissed with respect to Arrowpoint defendants.

Count III alleges a claim of constructive fraud based on Arrowpoint defendants' alleged transference of assets and business opportunities from Arrowpoint to Arrowpoint International in order to avoid making payments to plaintiff. Arrowpoint defendants and Arrowpoint

---

[2] It is worth noting briefly that *Augusta Mutual Insurance Co. v. Mason*, 645 S.E.2d 290, 294 (2007), has little bearing on the fraud claims asserted here. At issue in *Augusta Mutual* was a claim by an insurance company against an employee-agent who allegedly misrepresented a client's liability risk and accordingly fraudulently induced the insurer to issue a policy. There, the Supreme Court of Virginia found that the agent's duties to his employer arose exclusively from an employment contract and thus sounded only in contract, and not in tort. *Id.* The Supreme Court of Virginia expressly distinguished that case from a situation in which the defendant "did not intend to fulfill its contractual duties when it entered into the agreement," clearly suggesting that such a fraudulent inducement claim—identical to the claim alleged here—is cognizable. *Id.*

International assert that Virginia does not recognize a common law claim of constructive fraud on these factual allegations, and further note that plaintiff failed to assert this claim under Va. Code § 55-80, which prohibits a conveyance made "with intent to delay, hinder or defraud creditors." While plaintiff did not specifically cite this section of the Virginia Code, it is clear that the factual allegations in Count III of the complaint, assumed to be true at this stage, create a plausible entitlement to relief under this statute. Accordingly, Count III is appropriately construed as a claim for relief under Va. Code § 55-80 and thus the motion to dismiss is denied in this respect.

Counts IV and V allege claims of "intentional misrepresentation" and "negligent misrepresentation," respectively. These claims rely on the same factual allegations alleged in Counts I and II, and they do not allege any valid claims for relief separate and distinct from the valid claim alleged in Count I. *See SuperValu, Inc. v. Johnson*, 666 S.E.2d 335 (Va. 2008) (holding that Virginia law does not recognize a claim for negligent misrepresentations on similar allegations). Accordingly, Counts IV and V are appropriately dismissed as duplicative.

*2. Against Bank Defendants*

With respect to the Bank defendants, the complaint simply contains no cognizable allegation of fraud. Plaintiff principally contends that Bank defendants had an affirmative duty to disclose the terms of the renegotiated financial covenants at the time that the Subordination Agreement was executed, and that the failure to disclose these covenant terms was fraudulent concealment.[3] Of course, this claim requires that the allegedly concealed facts were material.

---

[3] The claim that plaintiff was fraudulently induced by Bank defendants into signing the SRA fails for the same reason the claim fails against Arrowpoint defendants: there is no factual allegation of fraudulent conduct that occurred before plaintiff signed the SRA, and thus inducement is not

*See Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Cir. 1999). This assertion, however, is refuted by the plain terms of the Subordination Agreement, which enables Virginia Commerce Bank to modify the financial covenants at any time after the Subordination Agreement's execution "without the consent of or notice to" plaintiff. Compl. Ex. 2 at 3. It would defy logic to hold that Bank defendants had a duty to disclose pre-Subordination Agreement changes to the financial covenants when the Subordination Agreement expressly disclaimed any duty on their part to disclose post-Subordination Agreement changes. And, plaintiff could not have reasonably relied on those terms as they existed in October 2009, as the Subordination Agreement gave Virginia Commerce Bank power to change those terms at any time.

Additionally, there is no plausible claim of fraudulent concealment by Bank defendants of an intent not to perform on the Subordination Agreement, for as discussed below, there is no allegation that plausibly shows that Bank defendants have breached any contractual obligations to plaintiff. This absence of "prompt, substantial nonperformance" renders implausible the claim of fraudulent concealment. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 380 (4th Cir. 2008). There is, therefore, no plausible allegation that Bank defendants did not intend to perform their obligations under the Subordination Agreement at the time that the contract was executed, and thus, under *Iqbal*, the fraud claims must be dismissed against Bank defendants. Additionally, because Bank defendants had no duty to disclose the terms of the financial covenants with Arrowpoint, and for the additional reasons discussed above with respect

---

adequately alleged. And, as discussed above, any representation that Arrowpoint would make timely payments to plaintiff beginning in February 2009 is a mere prediction of future events that does not create a viable fraud claim.

to Arrowpoint defendants, which reasons apply with equal force to Bank defendants, there was no fraudulent concealment by Bank defendants.

**B. Breach of Contract Claims**

Counts VI and VII allege that Arrowpoint and Virginia Commerce Bank have breached their contractual obligations to plaintiff. Specifically, in Count VI, plaintiff alleges that Arrowpoint has breached the promissory note by failing to make payments in accordance with the schedule attached thereto, and in Count VII, plaintiff alleges that Virginia Commerce Bank breached the Subordination Agreement by failing to notify plaintiff that Arrowpoint was in default of the credit facility agreement covenants. The motion to dismiss is appropriately denied with respect to Count VI but granted with respect to Count VII.

With respect to Count VI, plaintiff has adequately alleged a breach of contract claim against Arrowpoint. Plaintiff alleges facts that, if proven, plausibly establish (i) the existence of a contract—the promissory note, (ii) breach of that contract by Arrowpoint—failure to make payments under the note, and (iii) injury resulting from the alleged breach. Arrowpoint asserts that its breach of the note is excused by its default on its obligations to Virginia Commerce Bank under the credit facility agreement, and indeed, evidence produced during discovery may reveal that this defense is valid and requires that summary judgment be granted in Arrowpoint's favor. The only conclusion reached here is that the factual allegations in the complaint are sufficient to create a plausible entitlement to relief on the breach of contract count against Arrowpoint.

With respect to Count VII, however, plaintiff has not alleged a facially plausible breach of contract claim. Specifically, plaintiff alleges that Virginia Commerce Bank's failure to notify him of Arrowpoint's default on the financial covenants constituted a breach of the Subordination

Agreement. Yet, it is pellucidly clear from the plain language of the Subordination Agreement that Virginia Commerce Bank was not obligated to notify plaintiff of Arrowpoint's default; if anything, the bank's failure to provide the notification could negate Arrowpoint's defense for its failure to make timely payments to plaintiff, but it would not in any event constitute a breach of the Subordination Agreement by Virginia Commerce Bank.[4] Thus, because plaintiff has not alleged any facts that, assumed to be true, would plausibly state a breach of contract claim, Count VII is appropriately dismissed.

### C. Business Conspiracy and Unfair Trade Practices Claim

In Count VIII, Plaintiff alleges that Arrowpoint defendants and Bank defendants "conspired to deprive Plaintiff of his business and his reasonable expectancy of profit therefrom."[5] This conclusory allegation is insufficient, under *Iqbal* and *Twombly*, to state a valid claim for relief. Specifically, the factual allegations contained in the complaint do not support an

---

[4] Specifically, the Subordination Agreement provides that

> until such time as a default may occur or a demand for payment may be made upon any portion of the Superior Indebtedness, and until Bank shall notify the Subordinated Creditor in writing of the occurrence of such default or of any such demand for payment, Obligor may continue to remit, and Subordinated Creditor may retain regular scheduled monthly periodic payments of principal and interest as may become due and payable upon the Subordinated Indebtedness . . . .

Compl. Ex. 3 at 2. This language does not indicate that the bank had any affirmative obligation to notify plaintiff of default; it only suggests that plaintiff could continue to receive payments until the time at which he received such notification. If Virginia Commerce Bank failed to provide the required notice, then plaintiff could continue to receive payments from Arrowpoint.

[5] Although the complaint does not specify the source of the cause of action, it is assumed that plaintiff seeks to proceed under the Virginia Business Conspiracy Act, Va. Code § 18.2-499, as there is no cognizable common law cause of action for business conspiracy separate and distinct from a common law conspiracy claim.

inference that Bank defendants engaged in a conspiracy to harm plaintiff's business interests. To the contrary, there are no factual allegations that conceivably—let alone plausibly—suggest that Virginia Commerce Bank had *any* motive to combine with Arrowpoint "for the purpose of [] willfully and maliciously injuring [plaintiff] in his reputation, trade, business, or profession." Va. Code 18.2-499. Specifically, there is no allegation that Satterly or Virginia Commerce Bank possess any malice or ill will toward plaintiff, or that they had any other reason to want to injure plaintiff's business. Moreover, as discussed above, the complaint contradicts any suggestion that Bank defendants discussed any plan to deprive plaintiff of his business interests prior to execution of the SRA in August 2008.

To the contrary, the complaint and the agreements attached thereto show that plaintiff signed agreements, after arms-length negotiation, (i) that makes his sale of Arrowpoint shares contingent on Virginia Commerce Bank's approval, (ii) that subordinates the debt owed him to that owed Virginia Commerce Bank, and (iii) that empowers Virginia Commerce Bank to modify the terms of its financial covenants with Arrowpoint at any time without notice to plaintiff. There is no plausible basis to conclude that plaintiff—a business executive with significant financial resources and savvy—was somehow "duped" into agreeing to these terms as a result of a conspiracy between Bank defendants and Arrowpoint defendants to injure his business interests. Indeed, as Bank defendants note in their briefs, if Virginia Commerce Bank had wanted to prevent plaintiff from receiving payment on the note, it could simply have declined to approve the SRA in the first instance. Thus, because the factual allegations in the complaint do not create plausible inferences of conspiracy or unfair trade practices, this count is appropriately dismissed.

## D. Equitable Claims for Relief

Plaintiff requests *quantum meruit* recovery from Arrowpoint (Count IX), unjust enrichment recovery against Arrowpoint defendants (Count X) and reformation of the SRA, promissory note, and Subordination Agreements (Count XIII).

*Quantum meruit* and unjust enrichment claims are only appropriate in the absence of an *enforceable* contract. Thus, where there is an express contract, but the validity of the contract is challenged, a plaintiff may plead *quantum meruit* and unjust enrichment claims as alternative theories of liability. *See Royer v. Bd. of County Supervisors of Albemarle County*, 10 S.E.2d 867 (Va. 1940). But in this case, there are no factual allegations plausibly supporting the invalidity of the contracts, and moreover, Arrowpoint defendants represent that they do not intend to challenge the validity of those contracts. Accordingly, the *quantum meruit* and unjust enrichment claims are appropriately dismissed. In the event that the validity of the contracts is ultimately challenged, plaintiff may seek leave to amend the complaint accordingly.

Equitable reformation is available only when (i) there is a unilateral and material mistake of fact (ii) caused by misrepresentation and fraud (iii) that is reasonably relied upon by the mistaken party in entering into the contract. *Ward v. Ward*, 387 S.E.2d 460, 462 (Va. 1990). As discussed above, plaintiff has not stated a valid claim of misrepresentation or fraud against Virginia Commerce Bank. Accordingly, the claim for reformation of the Subordination Agreement is appropriately dismissed. Nonetheless, although it is doubtful that equitable reformation is appropriate in a case such as this one, because a fraudulent inducement claim survives Arrowpoint defendants' motion to dismiss, the reformation count should remain as well

with respect to Arrowpoint defendants.[6]

**E. Claims for Declaratory Relief**

*1. Against Arrowpoint*

In Count XI, plaintiff seeks declarations against Arrowpoint (i) that the noncompetition provisions of the SRA are unenforceable, (ii) that no default occurred that could have excused Arrowpoint's obligations to pay plaintiff under the promissory note, and (iii) that Bank defendants did not properly notify plaintiff under a default in a manner that would have excused Arrowpoint's obligations to pay on the note. Arrowpoint does not seek dismissal of the first request. Arrowpoint does, however, seek dismissal of the second and third requests. In support of this motion, Arrowpoint asserts (i) that plaintiff is not allowed, under the Subordination Agreement, to contest whether Arrowpoint is in default of its credit facility agreement with Virginia Commerce Bank, and (ii) that a declaration that Arrowpoint is obligated to make payments on the note is premature because Arrowpoint is still in the process of making payments under the promissory note. The first argument assumes an interpretation of the Subordination Agreement that is not plain on the face of that contract, and thus does not state a valid basis for dismissing this claim at the threshold. The second argument ignores the acceleration clause that is present in the promissory note. As plaintiff has purported to exercise this clause, the entire outstanding value of the note could presently be due and payable. Thus, the mere fact that Arrowpoint is currently making monthly payments does not moot plaintiff's request for

---

[6] It is worth noting that Arrowpoint defendants did not advance a legal argument for their assertion that plaintiff is not entitled to reformation of the SRA and the promissory note. Instead, Arrowpoint defendants merely asserted that they agreed with the reasoning set forth in Bank defendants' pleadings, notwithstanding the significant differences between the claims asserted against Arrowpoint defendants and Bank defendants.

declaratory relief. Accordingly, the motion to dismiss Count XI must be denied.

*2. Against Arrowpoint and Virginia Commerce Bank*

In Count XII, plaintiff seeks declarations against Arrowpoint and Virginia Commerce Bank (i) that Virginia Commerce Bank breached the Subordination Agreement, and that this alleged breach negates any defenses to breach of contract that Arrowpoint could assert arising from operation of the Subordination Agreement, (ii) that as a party in breach of the Subordination agreement, Virginia Commerce Bank cannot enforce the Subordination Agreement, (iii) that Arrowpoint is not excused from payment by the Subordination Agreement due to Virginia Commerce Bank's breach of that agreement, (iv) that the promissory note and Subordination Agreement must be read in a manner that affords plaintiff a judicial remedy in the event Arrowpoint fails to make payments under the note, (v) that the Subordination Agreement does not apply to a tort action, and (vi) that Virginia Commerce Bank would not be enforcing its rights under the Subordination Agreement by defending plaintiff's tort action against Bank defendants.

To begin with, the first three requests, by their plain terms, are appropriate only if Virginia Commerce Bank has breached the Subordination Agreement. Yet, as discussed above, there is no plausible allegation of any breach by the bank. Accordingly, requests (i), (ii), and (iii) of Count XI must be dismissed. Moreover, a request that the Subordination Agreement "be read" in a manner that affords him a remedy is nothing more or less than a thinly veiled request for reformation, and as such, it is entirely redundant with Count XIII of the complaint. It therefore would not "serve a useful purpose in clarifying and settling the legal relations in issue." *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 375 (4th Cir. 1994). Accordingly, request (iv)

is appropriately dismissed.

Finally, requests (v) and (vi) relate to whether plaintiff is barred by the Subordination Agreement from bringing this action, and whether plaintiff may be responsible under the Subordination Agreement for Virginia Commerce Bank's attorney's fees in connection with defending this suit. As Virginia Commerce Bank notes, no defendant has yet asserted either claim that plaintiff seeks to have foreclosed by declaratory judgment, even though there is little doubt that these claims would have to be asserted by defendants in this action or otherwise be foreclosed by *res judicata*. Accordingly, these claims for declaratory relief do not presently state a live controversy. In the event that these claims are ultimately asserted by defendants, plaintiff may request leave to amend his complaint accordingly. Thus, Count XII is appropriately dismissed in its entirety.

## V.

In sum, plaintiff has not stated any valid claims for relief against Bank defendants. Additionally, against Arrowpoint defendants, three of his fraud claims (Counts II, IV, and V) do not state valid claims for relief, nor does his business conspiracy claim (Count VIII) his second claim for declaratory relief (Count XII), nor his claims for recovery on theories of *quantum meruit* (Count IX) and unjust enrichment (Count X). Accordingly, these claims are appropriately dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P., and in accordance with the Supreme

Court's recent opinion in *Iqbal*. Nonetheless, plaintiff's factual allegations do give rise to plausible inferences that he is entitled to relief on two fraud claims (Counts I and III), his breach of contract claim (Count VI), his claim for reformation (Count XIII), and his first claim for declaratory relief (Count XI). Accordingly, these claims shall proceed.

An appropriate Order will issue.

Alexandria, Virginia
May 11, 2010

/s/
T. S. Ellis, III
United States District Judge