**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

TODD A. WEILER,

Plaintiff,

v.

ARROWPOINT CORPORATION,

CHRYSTLE SMALL

and

ARROWPOINT INTERNATIONAL CORPORATION,

Defendants.

Civil Action No. 1:10-cv-157 TSE

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO STRIKE EXPERT REPORT AND TO EXCLUDE EXPERT**

Plaintiff Todd Weiler's ("Plaintiff" or "Weiler") submits this memorandum of law in opposition to the motions by Defendants Jeffrey Satterly ("Satterly") and Virginia Commerce Bank ("the Bank"; collectively, "Arrowpoint Defendants"), and by Chrystle Small ("Small") and Arrowpoint Corporation and ("Arrowpoint"; collectively, "Arrowpoint Defendants") to strike Plaintiff's his expert witness report and to exclude his expert witness, and states as follows:

## I. STATEMENT OF RELEVANT FACTS

A. Defendants' Motions Were Mooted by the Court's July 2, 2010 Order.

On June 24, 2010, Plaintiff Weiler filed a motion for leave to name additional experts responsive to the efforts of then non-party Bank (by purported assignment) and Defendant Arrowpoint (by counterclaim) to assert that Subordination Agreement ("SA", Exhibit 2) seeking to bar Plaintiff's contract action and to seek payment of the Bank's attorney fees from Plaintiff.

Because counsel for the Bank had represented in numerous pleadings and in open court that the Bank was not asserting the SA and the Bank was dismissed from the case on that basis, and because the Bank was not a party to the case on the date for naming expert witnesses, Plaintiff Weiler had not had the opportunity to present an expert witness on the myriad issues introduced into the case by the Defendants' assertion of the SA.

In the event that Defendants were allowed to assert the SA, Plaintiff's June 24 motion sought leave to sponsor expert testimony from two expert witnesses. Although Plaintiff had not then interviewed or received opinions from an expert witness, Plaintiff expected to introduce expert testimony on the following subjects:

> Plaintiff requests leave to name two expert witnesses, a banking expert and a finance expert. The banking expert would offer testimony concerning the commercial reasonableness of the SA. Plaintiff expects the expert would testify that it would be commercially unreasonable in the circumstances to obtain Weiler's signature to the SA without informing him that the SA would likely result in Arrowpoint not being permitted to pay the $3 million promissory note Weiler received as consideration only after executing the SA. The expert would further testify that the SA is inconsistent with ordinary and customary practices in the banking industry to the extent it was based on loan covenants that the debtor Arrowpoint could not reasonably meet in the foreseeable future and that it is unreasonable to base the underlying loan covenants on financial projections when actual financial performance reports showing those projections were inaccurate were available. Further, the expert would testify that the term "default" under the SA means a non-payment by Arrowpoint under Arrowpoint's debt to the Bank, not simply a breach of the loan covenants made by Arrowpoint, based on the documented course of dealing between Arrowpoint and the Bank and based on industry custom and practice. The expert would also testify that the Bank by repeatedly failing to declare defaults under the loan agreement with Arrowpoint, itself waived breach of the loan covenants as a default and established a course of dealing that precludes reliance on the loan covenants as an event of default. The expert would further testify that the custom and practice in the banking industry in Virginia and in the Washington, D.C. area is that subordination agreements are not assignable, in whole or in part, without assignment of the underlying indebtedness secured by the subordination agreement. He would also testify that the custom and practice in the banking industry is that a debtor is not a third-party beneficiary of a subordination agreement.
>
> Plaintiff would also call a finance expert to testify that the underlying loan covenants were based on unrealistic and inflated income and profit

> projections of Arrowpoint. He would testify that the actual financial reports that were available to the Bank at the time it relied on the projections show both that the financial projections relied upon were grossly inaccurate and inflated and that Arrowpoint could not meet the projections. He would testify further that, based on the data available at and before the time the SA was signed, it was highly likely, if not certain, that Arrowpoint would be in default of the loan covenants by a significant margin and would not be able to recover from the default for the foreseeable future.

Plaintiff's Memorandum (ECF Doc. 132; June 24, 2010) at 3-4.

Arrowpoint opposed Plaintiff's motion to name an additional expert witness. Memorandum of Arrowpoint Defendants in Opposition of Plaintiff's Motion to Name Additional Expert Witnesses (ECF Doc. 142; June 30, 2010). Although the Bank Defendants continued to participate in this case after their dismissal, the Bank Defendants did not oppose Plaintiff's motion to name an additional expert witness. Over Defendants' objections the Court granted Plaintiff's motion to name an additional expert as follows:

> ORDERED that the motion is granted. Plaintiff's initial expert disclosures as to the banking and finance issues are due July 16, 2010.

Order (ECF Doc. 157; July 2, 2010). Mr. Schwartz' report offers the same expert opinions approved by the Court's July 2, 2010 Order. Defendants did not appeal or object to the July 2, 2010 Order, and that Order is now the law of the case. Defendants cannot now object to the subjects of expert testimony stated in Weiler's June 25, 2010 motion when Defendants failed both to raise those arguments in opposition to the motion and to appeal the July 2 Order.

B. The Expert Witness Report Was Prepared in Accordance with the Court's Order.

Although the Court granted Plaintiff leave to designate two experts, Plaintiff instead again designated a single expert, Lawrence Schwartz, C.P.A., whom Plaintiff had first designated on May 11, 2010. Defendants made no objections to Mr. Schwartz's credentials when he was first designated. In fact, Mr. Schwartz is not only a certified public accountant, but also a

founder and a director of two community banks, one of which is located in Northern Virginia. Mr. Schwartz is a 20-year bank director who has served on the Audit Committee. Mr. Schwartz is an Adjunct Professor of Accountancy in the School of Business at The George Washington University and "has taught auditing, accounting fundamentals and financial statement analysis at the undergraduate and graduate levels and has taught cost accounting concepts to community bankers in Thailand." Exhibit 4. Mr. Schwartz has been actively involved loan management activities in the bank for twenty years and has served on the loan committee for two banks for many years. Mr. Schwartz also teaches seminars to bank directors and audit committees. Mr. Schwartz states that his opinions are based on his experience, personal knowledge and his review of all documents produced in this case and Plaintiff's trial exhibits. Plaintiff's trial exhibits, which alone fill a box, contain all of the agreements, financial statements and projections, correspondence and other communications relevant to this case.

In the expert report, ¶¶ 1-6 recount the credentials, experience, knowledge and information reviewed by Mr. Schwartz. The terms "default" and "notice" are not defined in the SA, and to the extent that the terms are ambiguous and, in the context of commercial loans are not commonly understood by lay jurors, they are amenable to expert opinion. The term "Superior Indebtedness" is also not defined under the SA and, to the extent the term is ambiguous, a lay juror would not ordinarily understand the distinction between indebtedness such as the Superior Indebtedness and a note.

The term "default" is not defined in the SA. Mr. Schwartz gives opinions in ¶¶ 8-13 on the prevailing industry standards for a notice of default under a commercial loan, which is a matter within his expert competence. In ¶ 15, Mr. Schwartz gives his opinions on the prevailing standards in the Washington, D.C. metropolitan area for a commercial loan default. In ¶¶ 16-17,

In ¶¶ 18 and 20, Mr. Schwartz, based on his knowledge of custom and usage in the lending industry and the terms of the SA, states that notice of default must contain a clear statement that the Bank has declared a default under a loan. In ¶ 19-24, Mr. Schwartz opines, on the same basis, that a minor payment deficiency is not considered to be a default under a commercial loan and that, under standard practice in the lending industry, a default does not occur when there is noncompliance with technical loan covenants, unless those loan covenants are specifically incorporated in a subordination agreement. In ¶ 25, Mr. Schwartz states that, based on standard practice in the lending industry, oral agreements are used to define default when no definition is stated in a written agreement. In ¶ 26, Mr. Schwartz states that, based on standard practice in the lending industry, that commercially reasonable notice of default is an unambiguous written statement of the default. In ¶ 29, Mr. Schwartz opines that no notice of default occurred under industry standards of notice, thereby demonstrating that the Bank did not assert the SA. In ¶¶ 30-32, Mr. Schwartz opines that the Bank comported with lending industry and practice by not declaring Arrowpoint in default over noncompliance with technical financial covenants.

Mr. Schwartz will offer the opinion that it is ordinary and customary in Virginia commercial banking transactions that a subordination agreement incorporate by reference specific default terms from an identified loan document as grounds for default under the subordination agreement. ¶¶ 14-16. Thus, when a subordination agreement relies on loan covenants in a note as an event of default, industry practice in Virginia is to refer to and incorporate the specific loan covenants in the subordination agreement. The SA did not incorporate any terms of a loan document by reference, but merely stated that payment could not be made under the SA when Arrowpoint was in default of the Superior Indebtedness. Mr. Schwartz offers the opinion that where a "default" is not defined in a subordination agreement,

the generally accepted lending industry meaning of default would be non-payment. In addition, Mr. Schwartz offers the opinion that in addition to not incorporating any loan document terms into the SA or otherwise defining default in the SA, the SA refers to a "default" of indebtedness (the "Superior Indebtedness") not a default under particular terms of a note. He offers the opinion that an "indebtedness" is commonly understood to mean in commercial loan transactions the sum of money owed, not the particular terms of any note or other instrument. ¶ 15. Stated otherwise, Mr. Schwartz offers the opinion that a default on an indebtedness, such as was the case here, has an accepted commercial meaning of non-payment of the indebtedness.

In ¶¶ 27-28, Mr. Schwartz opines that the actual financial results were not used in preparing the financial covenants due to the wide disparity between the covenants and actual results, and that the actual financials show that the covenants could not be met. In ¶ 33, Mr. Schwartz gives the result of his calculation of what Arrowpoint owes Weiler under his Note.

C. Plaintiff Requires Expert Testimony on Lending Terms of Art Undefined in the Documents.

Defendants' attorneys drafted all of the documents at issue in this case to Defendants' own specifications. Defendants are now asserting that the SA bars Plaintiff's contract action and entitles Bank Defendants to attorney fees. Bank Defendants' SA fails to define default, notice and other key terms. Defendants nonetheless argue (1) that the term "default" under the SA means noncompliance with the financial covenants in the September 25, 2008, letter of credit agreement between Arrowpoint and the Bank; and (2) that Plaintiff was not entitled to notice or any form of notice. Defendants' arguments are disproved by usage, custom and practice in the lending industry and by the terms of the agreements.

Weiler was never a party to the Facility, however, and its terms were not disclosed to Weiler when he signed the SA, surrendered his shares and accepted the Promissory Note

("Note", Exhibit 3) on October 15, 2008. The Facility was nowhere incorporated by reference into the August 11, 2008 Stock Redemption Agreement ("SRA", Exhibit 1), the SA or the Note. Second, by its terms, the SA expressly permits Arrowpoint to pay Weiler "until such time as a default may occur or a demand for payment may be made upon any portion of the Superior Indebtedness." Ex. 2, SA at 2 ¶ 6. Expert witness testimony would appropriately state lending industry usage, custom and practice of expressly incorporating by reference and appending other documents that define terms in the document at issue (in this case the SA).

The SA could excuse payment only "if default may occur or a demand for payment may be made upon any portion of the ***Superior Indebtedness***." *Id.* (emphasis added). Further, by the SA, "payment of any and all of the Subordinated Debt is expressly subordinated to the ***Superior Indebtedness***." SA at 1 ¶ 1 (emphasis added). By subordinating Weiler to Superior Indebtedness, the SA subordinated Weiler to amounts of money actually owed by Arrowpoint to the Bank, and not to undisclosed and unincorporated financial covenants under the Facility. Expert witness testimony would appropriately state lending industry usage, custom and practice that, in a subordination agreement, "superior indebtedness" does not include other documents or their covenants unless the same are expressly defined as superior indebtedness by the document at issue.

The SA defines "Subordinated Debt" as "indebtedness evidenced by that certain Subordinated Non-Negotiable Promissory Note dated August 8, 2008, from ARROWPOINT CORPORATION" to Weiler. SA at 1 ¶ 3. The Bank, through the SA, could easily have made Weiler's promissory note expressly subordinate to the terms of Arrowpoint's note to the Bank, but chose not to do so. Instead, the SA makes Weiler's note subordinate to the Superior Indebtedness, which is merely a sum of money owed by Arrowpoint to the Bank. In plain terms,

Subordinated Debt under the SA is ***money*** owed by Arrowpoint to Weiler, rather than a loan documents and certainly does not include financial covenants in a loan document nowhere mentioned in the SA, as Defendants argue. "Superior Indebtedness" is likewise defined as follows at SA at 1-2 ¶ 4 as ***money*** owed to the Bank:

> The term "Superior Indebtedness" as used in this Subordination Agreement shall mean and include, to the ***maximum principal sum of $2,500,000,00, all principal, interest, fees, costs, and other charges, including attorney's fees, as may be now or hereafter due and owing from Obligor to Bank or Bank's successors or assigns in connection with a commercial revolving line of credit in the maximum principal sum of $2,500,000.00 now outstanding or hereafter made or extended by Bank to the above-mentioned ARROWPOINT CORPORATION***, and in connection with all documents now outstanding or hereafter executed evidencing, securing, and guarantying such financing, and all extensions, renewals, modifications, and consolidations hereafter executed with respect to the same, including without limitation those documents which may now or hereafter release any collateral or guaranties for such financing, and further including, again without limitation, ***any and all post-petition interest*** upon any of the foregoing which accrues after the commencement of any bankruptcy proceedings by or against the Obligor [emphasis added].

Under the SA, the Superior Indebtedness is neither the Facility nor any other instrument or document. Expert witness testimony would appropriately state lending industry usage, custom and practice that superior indebtedness under a subordination agreement is money owed by the borrower to the superior creditor unless that subordination agreement expressly defines and incorporates other documents and their terms as part of the superior indebtedness.

The SA subordinates Weiler's Subordinated Debt under his Note exclusively to the Bank's Superior Indebtedness. The terms of the Facility are not included in the definition of the Superior Indebtedness, so that the Superior Indebtedness includes or incorporates all terms of the Facility. Defendants could conceivably argue that the Facility is vaguely referenced as a document "in connection with" the Superior Indebtedness, merely to further identify the origin of the money owed that is the Superior Indebtedness. The SA subordinates Weiler's Note only to Arrowpoint's debt to the Bank under the facility as the document under which the debt occurs, but not to its financial covenants or any other technical terms and conditions of the facility itself.

The Facility is nowhere incorporated, referenced or even mentioned in the SA. Expert witness testimony would appropriately state lending industry usage, custom and practice that subordinated indebtedness under a subordination agreement is not subordinated to other documents and their covenants unless that subordination agreement expressly defines and incorporates other documents and their terms as part of the superior indebtedness.

The express terms in SA § 6 state the following:

> While any Superior Indebtedness remains unpaid or until there is any obligation on the part of Bank to advance monies which would constitute Superior Indebtedness hereunder, the Subordinated Creditor will not ask for, demand, sue for, take, receive or accept from the Obligor, by setoff or in any other manner, any payment or distribution on account of the Subordinated Debt nor present any instrument evidencing the Subordinated Debt for payment. ***Notwithstanding the foregoing, until such time as a default may occur or a demand for payment may be made upon any portion of the Superior Indebtedness, and until Bank shall notify the Subordinated Creditor in writing of the occurrence of such default or of any such demand for payment, Obligor may continue to remit, and Subordinated Creditor may retain regular scheduled monthly periodic payments of principal and interest as may become due and payable upon the Subordinated Indebtedness, with such payments therein described not to be paid more than thirty (30) days in advance of the due date for such payments, and with the Subordinated indebtedness not to otherwise be prepaid in whole or in part. Any such notice of default upon the Superior Indebtedness shall be deemed complete upon a single delivery or two business days after the date of mailing by certified mail, postage prepaid, return receipt requested, addressed to the Subordinated Creditor as its address as first set forth hereinabove***, or at any other address of which the Subordinated Creditor shall notify Bank in writing at its address first set forth hereinabove [emphasis added].

Because the SA does not expressly define the term "default," expert testimony concerning the commonly accepted meaning of the term "default" under a subordination agreement would be helpful to the jury in interpreting SA § 6, should the Court find that the language is ambiguous. Further, although the term "notice" used in SA § 6 seems to clearly mean written notice of default sent by certified mail, Plaintiff offers Mr. Schwartz to testify that a notice of default must contain a clear and unambiguous statement of a loan default. This testimony will be helpful to

jurors.

Expert testimony would also be required to show the jury that it was patently impossible for Arrowpoint to meet the loan covenants at the time Weiler signed the SA based on Arrowpoint's then current financials in the possession of the Bank. Such evidence is relevant to the issue of whether Mr. Satterly made a knowing false statement to Weiler when he informed Weiler that he would be paid under the SA so long as Arrowpoint was current on its payments to the Bank.

## II. ARGUMENT

### A. Expert Testimony Must Be Admitted to Assist the Trier of Fact on Lending Terms.

Defendants have argued that the term "default" in the SA means noncompliance with the financial covenants in the facility. Plaintiff Weiler has alleged that a default could only occur under the SA if Arrowpoint failed to pay the Bank amounts when due. Because the parties have widely divergent views of the meaning of "default" under the SA, the meaning of default is subject to proper expert testimony from an expert in bank lending practice, custom and usage in Northern Virginia such as Mr. Schwartz. The Court clearly has discretion to admit such testimony as follows:

> The trial court has broad discretion to determine whether to admit expert testimony. *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 323 (4th Cir. 1982). That determination will not be reversed absent a clear abuse of discretion. *Friendship Heights Assocs. v. Vlastimil Koubek*, 785 F.2d 1154, 1159 (4th Cir. 1986).

*United States v. Nwaigwe*, 225 F.3d 656 (4th Cir 2000) (Table). It nonetheless may be an abuse of discretion to exclude an expert witness. *Friendship Heights Assocs. v. Koubek*, 785 F.2d 1154, 1159-60 (4th Cir. 1986); *Garrett v. Desa Industries, Inc.*, 705 F.2d 721, 724 (4th Cir.1983).

In an appropriate case, this Court has even stated that "liability in this case could only be established through expert evidence." *Factory Mut. Ins. Co. v. DLR Contracting, Inc.*, 2005 WL 2704502 (E.D. Va. 2005). The Court has discretion to "admit expert testimony where the facts were of a technical nature, but not if the evidence related to matters within the juror's common experience." *Id., citing United States v. Nwaigwe*, 225 F.3d 656 (4th Cir 2000) (Table). In this case, technical lending terms such as the meaning of "default" when undefined in a commercial loan document, financial covenants, commercial reasonableness of notice, and the interplay of bank lending documents as to the terms superior indebtedness, subordinated indebtedness and senior secured lender, are not "within the juror's common experience," and therefore are appropriate subjects for expert testimony.

The test of admissibility of expert testimony under Rule 702 of the Federal Rules of Evidence is whether the testimony assists the trier of fact in the case. If the expert testimony would assist the trier of fact, it could be an abuse of discretion to exclude such testimony:

> "Rule 702 speaks in terms of assisting the trier of fact. It makes no distinction in its application depending on whether the trier of fact is a judge or a jury. Although a district judge who is functioning as the trier of fact is not bound to accept the testimony of an expert witness, he may not abuse his discretion in refusing to hear such testimony."

*Proctor v. Tsao*, 164 F.3d 625 (4th Cir. 1998) (Table), *quoting Friendship Heights Assocs. v. Koubek*, 785 F.2d 1154, 1163 (4th Cir. 1986). In turn, *Koubek* has been cited for the following proposition:

> Where the excluded evidence is highly relevant and we cannot be certain that its absence did not prejudice the outcome, the error is not harmless. Because we cannot say that the district court's error was harmless, we find that a new trial is warranted.

*Sandberg v. Virginia Bankshares, Inc.*, 979 F.2d 332, 355 (4th Cir. 1992) (citations omitted).

Thus, a presumption exists in favor of expert testimony being helpful to the jurors under

the following rule of law articulated by the United States Court of Appeals for the Fourth Circuit:

> Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror.

*Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993), *citing Persinger v. Norfolk & W. Ry.*, 920 F.2d 1185, 1188 (4th Cir. 1990). Accordingly, "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Gibbes, Inc. v. Law Engineering, Inc.*, 960 F.2d 146 (4th Cir. 1992)(Table), *quoting Larabee v. M M & L Int'l Corp.*, 896 F.2d 1112, 1116 n.6 (8th Cir. 1990)

Courts are subject to the following strict rule on excluding experts:

> Generally, the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered. One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.

*Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989), *citing Martin v. Fleissner GMBH*, 741 F.2d 61, 64 (4th Cir.1984). This Court has faithfully applied the holding in *Kline* as follows:

> In *Thomas J. Kine, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir.1989), the United States Court of Appeals for the Fourth Circuit stated that the test for exclusion of expert witnesses "is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered." *Id.* The court also noted "[o]ne knowledgeable about a particular subject need not be precisely informed about all the details of the issues raised in order to offer an opinion." *Id.*

*Washington v. McKee*, 2006 WL 2252064 (E.D. Va. 2006).

Mr. Schwartz is clearly knowledgeable about the subjects of his opinions. In his report, Mr. Schwartz states that he has reviewed the documentary record in this case. Because Mr. Schwartz clearly "has [been] given facts sufficient to form a reasonable foundation for his opinion", "it is up to the trier of facts to determine his credibility and the weight to be given his

opinion." *Leupen v. Keller Industries, Inc.*, 881 F.2d 1069 (4th Cir. 1989) (Table), *citing Kale v. Douthitt*, 274 F.2d 476, 482 (4th Cir.1960); *Spesco v. General Electric Co.*, 719 F.2d 233, 237-38 (7th Cir.1983).

This Court has found that technical lending issues are appropriate subjects for expert testimony. *In re EPIC Mortg. Ins. Litigation*, 701 F. Supp. 1192, 1242 (E.D. Va.1988)("The uncontradicted testimony was that if the insurers had known the truth about the EPIC Program, it would not have insured the loans. Dr. Plotkin confirmed this fact with expert testimony. The misstatements were therefore material."). The decisions of the United States Court of Appeals for the Fourth Circuit are to the same effect, allowing a banking expert to testify even to the ultimate issue in a case as follows:

> Expert testimony is permissible where specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. Fed. R. Evid. 702. The facts in this case involve a number of transactions in two separate financial institutions over a fiveweek period and touch upon esoteric subjects such as "float," the posting of deposits, and check clearing. Given the intricate nature of these matters, the district court's qualification of Ms. Hubbard as an expert was not an abuse of discretion.
>
> Although an expert may not testify on whether the defendant did or did not have the mental state or condition constituting an element of a crime or defense, an expert may express an opinion on an ultimate issue. *See* Fed. R. Evid. 704. Nevertheless, such an opinion cannot amount to a legal conclusion.

*United States v. Ryland*, 993 F.2d 1541 (4th Cir. 1993) (Table), *citing Shahid v. City of Detroit*, 889 F.2d 1543 (6th Cir. 1989). Mr. Schwartz's opinion are all the more helpful to the trier of fact in this case because so many critical terms are undefined, and thus ambiguous, and because Defendants try to define the SA term "default" not according to the SA itself, but instead according to the loan covenants of the facility.

B. The Ambiguous Contract Terms Are Proper Subjects of Expert Testimony.

The SA did not define technical lending terms such as default, financial covenants, commercial reasonableness of notice, and the interplay of bank lending documents as to superior indebtedness, subordinated indebtedness and senior secured lender. The parties have widely divergent views of default under the SA, as Weiler contends that default is limited to failure of Arrowpoint to pay the Bank what is owed, and Defendants claim that default under the SA is noncompliance with financial covenants under the SA. Therefore, the SA could be found to be ambiguous. A real estate expert properly gave evidence of industry custom and usage to interpret an ambiguous contract as follows:

> Evidence of custom and usage is relevant to the interpretation of ambiguous language in a contract. The information Halper supplied directly addressed the ambiguity in Paragraph 3.B., and as such the district court properly admitted the testimony.

*W.H. Smith Hotel Services, Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994); *citing In re Pearson Bros. Co.*, 787 F.2d 1157, 1161 (7th Cir. 1986).

Similarly, an expert is appropriately admitted to testify to the meaning of terms of art in a contract. *Transpro, Inc. v. Leggett & Platt, Inc.*, 297 Fed. Appx. 434 (6th Cir. 2008); *Kona Tech. Corp. v. Southern Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir.2000); *Nucor Corp. v. Neb. Public Power Dist.*, 891 F.2d 1343, 1350 (8th Cir.1989). "Default" and the other terms of art, the meaning of which are in this case, are appropriate subjects for expert testimony.

C. The Expert Report Stated Ample Bases for the Stated Opinions.

Defendants argue that Mr. Schwartz did not adequately state the basis for his opinions. In fact, he stated that his opinions are based on his decades of experience in accounting and banking industry, serving on loan and audit committees, and teaching bankers and auditors, his personal knowledge, and his review of the documents in this case. This basis is more than

adequate under the following analysis:

> Pakter based his opinions on personal knowledge and experience, as well as a seemingly copious review of a multitude of relevant business documents. He and his firm conducted their own evaluations based on the materials before them and such knowledge and experience. It is not for this Court to decide whether those opinions are in fact accurate, only that they a based on a reliable method. If defendants believe Pakter's testimony to be flimsy, they can challenge his opinions through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof ..." *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798.

*ProtoComm Corp. v. Novell Advanced Services, Inc.,* 171 F.Supp.2d 473, 480 (E.D. Pa. 2001).

This principle has been amplified as follows:

> In this case, Wuebben based his opinion on a visit to the jetty site and on his review of several documents in evidence, including the relevant permits, photographs, internal Corps memoranda, and reports of other engineers. Wuebben also heard the testimony of several prior witnesses. These sources provided a sufficient factual basis for his testimony. Any weaknesses in the factual underpinnings of Wuebben's opinion go to the weight and credibility of his testimony, not to its admissibility.

*Hurst v. United States*, 882 F.2d 306 (8th Cir. 1989). Defendants likewise will have ample opportunity to challenge the weight and credibility of Mr. Schartz's testimony, but Defendants cannot prevent admission of that testimony on that basis. Because Mr. Schwartz states an ample basis for his expert opinions, the motion must be denied.

D. The Expert Opinions Do Not Interpret the Contract.

Defendants cite *America Online, Inc. v. St. Paul Mercury Ins. Co.*, 207 F.Supp.2d 459, 466 n.1 (E.D. Va. 2002) and similar cases to argue that Mr. Schwartz's opinions impermissibly interpret the parties contracts. Mr. Schwartz's opinions on lending industry terms in the contract and on lending industry trade, custom and usage do not interpret the parties' contracts. The parties have widely divergent views of the meaning of the terms of contracts, indicating that they are ambiguous. Expert testimony is appropriately offered to provide industry trade, custom and

usage to construe ambiguous contracts. *W.H. Smith Hotel Services, Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994); *citing In re Pearson Bros. Co.*, 787 F.2d 1157, 1161 (7th Cir. 1986). Mr. Schwatz's opinions are properly admitted to assist the trier of fact on the meaning of technical terms in the lending industry when those terms are undefined in the contract in which they are used.

## III. CONCLUSION

Accordingly, the motion should be denied and, further, Plaintiff's expert should be permitted to present his stated opinions as relevant to assist the trier of fact in this matter.

Respectfully submitted,

/s/ John D. Quinn
John D. Quinn
Virginia Bar # 24514
Stephen Sale
SALE & QUINN, P.C.
910 Sixteenth Street, N.W., Fifth Floor
Washington, DC 20006
Telephone: (202) 833-4170
Facsimile: (202) 887-5137
Attorneys for Plaintiff Todd A. Weiler

July 28, 2010

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was served by electronic court filing this 28th day of July 2010 on the following:

Douglas R. Kay, Esq.
Briglia Hundley Nuttall & Kay, P.C.
1921 Gallows Road, Suite 750
Vienna, VA 22182

Robert A. Angle, Esq.
Michael E. Lacy, Esq.
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219

/s/ John D. Quinn
John D. Quinn
Virginia Bar # 24514
Stephen Sale
SALE & QUINN, P.C.
910 Sixteenth Street, N.W., Fifth Floor
Washington, DC 20006
Telephone: (202) 833-4170
Facsimile: (202) 887-5137
Attorneys for Plaintiff Todd A. Weiler